UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>BNSF RAILWAY COMPANY,<br><br>                    Defendant. | CASE NO. C14-1488 MJP<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT, BNSF'S MOTION FOR SANCTIONS, BNSF'S MOTION TO EXCLUDE TESTIMONY |

THIS MATTER comes before the Court on Plaintiff Equal Employment Opportunity Commission's ("EEOC's) Partial Motion for Summary Judgment and Defendant BNSF Railway Company's ("BNSF's") Motion for Summary Judgment (Dkt. No. 91). Having reviewed the Motions, the Responses (Dkt. Nos. 98, 96), the Replies (Dkt. Nos. 99, 100), and all related papers, the Court hereby GRANTS EEOC's Motion on ADA liability and DENIES BNSF's Motion. A trial on damages will proceed as scheduled. After reviewing the related briefing, the Court further DENIES BNSF's Motion for Sanctions (Dkt. No. 114) and finds BNSF's Motion to Exclude Testimony (Dkt. No. 90) moot.

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 1

**Background**

1        The EEOC brings this case on behalf of Russell Holt, who applied for a position as a

2

3  senior patrol officer with BNSF in 2011.

4        I.     Factual Background

5        The facts material to liability are undisputed; because the Court is granting the EEOC's

6  motion on liability, the summary that follows places the evidence in the light most favorable to

7  BNSF.

8        Senior patrol officers with BNSF are certified police officers with responsibilities and

9  powers similar to those of government police officers. See 49 U.S.C. § 28101. Prior to applying

10  for the position with BNSF, Mr. Holt had been working as a patrol deputy and criminal

11  investigator with the Pulaski County Sherriff's Office in Arkansas between 2006 and 2011. (Holt

12  Decl., Dkt. No. 88 at 1–2; Holt Dep., Dkt. No. 85, Ex. 1 at 57:4–12; Holt Dep., Dkt. No. 91 at

13  10–20.)

14        In 2007 Mr. Holt suffered a back injury after lifting weights. (Holt Dep., Dkt. No. 91, Ex.

15  1 at 23:17–22; Heck Dep., Dkt. No. 91, Ex. 5 at 14:14–19.) According to an August 2007

16  medical record, several months after the injury, a doctor hypothesized the injury could have

17  occurred during the workout or previously during his work as a police officer. (Heck Dep., Dkt.

18  No. 91, Ex. 5 at 71:6–14.)  A 2007 MRI of Mr. Holt showed a two-level disc extrusion in his

19  back. (Heck Dep., Dkt. No. 91, Ex. 5 at 27:15–28:21.) Mr. Holt was treated with epidural steroid

20  injections, chiropractic care, physical therapy and medicines from 2007 to 2009 and continued to

21  receive chiropractic treatments through 2011. (See Heck Dep., Dkt. No. 91, Ex. 5 at 111–127;

22  Fender Records, Dkt. No. 91, Ex. 6.) He had an additional MRI in 2009, which showed a new

23  disc extrusion but improvement in other areas. (Heck Dep., Dkt. No. 91, Ex. 5 at 59:11–6017.)

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 2

1   During this period Mr. Holt did not miss any work as a police officer as a result of back pain.

2   (Holt Decl., Dkt. No. 88 at 1–2.)

3       In 2011 Mr. Holt interviewed for a position with BNSF. (Dkt. No. 91, Ex. 1 at 59:9–

4   61:15.) He received a conditional offer subject to passing a medical examination and criminal

5   background check. (Holt Dep., Dkt. No. 91, Ex. 1 at 61:18-62:8 & Ex. 2.)

6       BNSF uses a medical contractor, Comprehensive Health Service ("CHS"), to coordinate

7   its multi-step post-offer medical evaluation process. (Jarrard Dep., Dkt. No. 91, Ex. 7 at 46:12–

8   49:2.) Candidates are required to take a shoulder and knee physical capabilities test and a hair-

9   sample drug test, undergo a basic physical examination and psychological evaluation, and

10  complete a CHS medical questionnaire. (Id., Kowalkowski Dep., Dkt. No. 91, Ex. 8 at 49:9–

11  547.) CHS nurses review the questionnaire and may conduct follow-up interviews based on any

12  "yes" answers. (Dkt. No. 91, Ex. 7 at 46:20–48:8.) CHS was entitled to "clear" candidates after

13  the initial medical examination, but it could also send the applicant's information to BNSF's

14  medical department for review and a final decision. (Dkt. No. 91, Ex. 8 at 44:20–45:15.)

15      Here, Mr. Holt answered "yes" to two items in CHS's medical questionnaire: "Have you

16  ever had a back injury" and "Do you currently have or have you ever had . . . [b]ack pain?" (Dkt.

17  No. 91, Ex. 9 at 5–6.) He briefly explained, "Bulging dis[c] in 2007. Treated with chiropractic

18  care." (Id. at 5.) CHS conducted a follow-up interview in which records reflect that he reported

19  he had non-work related back strain, namely a "bulging disc," in 2007; had an MRI; and was

20  treated by a chiropractor for only four to six months. (Id. at 10.) CHS requested "back MRs" and

21  received Mr. Holt's MRI from 2007. (Id.) Mr. Holt also provided a letter from his treating

22  doctor, Dr. Heck, and a letter from his chiropractor, Dr. Fender. (Holt Dep., Dkt. No. 91, Ex. 1 at

23  65:15–22.)

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 3

1    Mr. Holt also had a physical examination by a physician named Dr. Hixson, who was

2  retained by CHS for this purpose. Again Mr. Holt reported a bulging disc and chiropractic

3  treatment. Dr. Hixson reported to BNSF that she found no abnormalities; no restrictions were

4  needed; and Holt was not likely to experience any symptoms in the next two years impairing his

5  performance or presenting a risk to the health and safety of himself or others. (Hixson Dep., Dkt.

6  No. 91, Ex. 10 at 35:14–37:16 & Ex. 1 at 71–74.) She did not have access to either the 2007 or

7  2009 MRI, but assumed that he had had one based on his report of a bulging disc. (Hixson Dep.,

8  Dkt. No. 91, Ex. 10 at 54:14–20.) She testified at her deposition that knowing that Mr. Holt had

9  an extruded rather than bulging disc would have led her to "look[ ] at the back a little more

10 closely and look[ ] more for signs of nerve root impingement." (Id. at 52:13–21.) She agreed that

11 it was "possible" that knowing that he had two extruded discs could have affected her

12 assessment. (Id. at 52:22–53:2.)

13   CHS then forwarded Mr. Holt's records—including the 2007 MRI, doctors' notes, and

14 Mr. Holt's completed questionnaire—to BNSF medical officer Dr. Jarrard for a review and a

15 final decision. (Dkt. No. 91, Ex. 7 at 118:5–121:3.) Dr. Jarrard reviewed the records but made no

16 decision about whether Mr. Holt could perform the senior patrol officer job safely because he

17 concluded that he lacked sufficient information. (Dkt. No. 91, Ex. 3 at 101:6–14.) Instead, he

18 composed a request to be sent to Mr. Holt by CHS which requested a radiologist's report of a

19 current MRI, with comparison to the 2007 MRI; pharmacy records for the past two years; and all

20 additional medical records for the past two years. (See Dkt. No. 91, Ex. 9 at 11.)

21   Mr. Holt testified that he sought an MRI but the doctor he spoke to would not approve it

22 because it was for a job application rather than because he was experiencing pain. (Dkt. No. 91,

23 Ex. 1 at 79:1–13.) Through emails and/or phone calls with BNSF representatives, Mr. Holt

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 4

1   explained that because he had been asymptomatic since 2009, his doctor would not approve it,

2   and therefore he would have to pay for the MRI. (Dkt. No. 30 at 3; Dkt. No. 85, Ex. A at 82:2–

3   22.) An MRI at Mr. Holt's doctor's office in the absence of insurance would have cost

4   approximately $2,000. (Dkt. No. 91, Ex. 5 at 23:6–7.) Despite Mr. Holt's requests, BNSF

5   refused to waive the requirement. (Dkt. No. 85, Ex. A at 82:23–83:11.) Because Mr. Holt did not

6   provide the MRI and other information Dr. Jarrard had requested, it treated him as having

7   declined the position, although he had not. (Dkt. No. 91, Ex. 3 at 170:2–12.)

8          BNSF also cites later medical evidence showing that Mr. Holt experienced additional

9   symptoms from his back condition, but because the Court does not base its holding on the

10  propriety of the request for an MRI from a medical perspective, it is not necessary to discuss

11  those facts in detail here.

12         II.     Procedural History and Summary of Argument

13         The Court previously denied BNSF's renewed motion to dismiss for failure to state a

14  claim. (Dkt. No. 28.) In the briefing on that motion, BNSF argued that the language of 42 U.S.C.

15  § 12112(d) explicitly authorized a post-conditional-job-offer, preemployment follow-up request

16  for an MRI after an initial medical examination required for all applicants if that request was tied

17  to issues revealed by the initial exam. (Dkt. No. 21 at 4–6.) BNSF also responded to the EEOC's

18  argument that BNSF's actions violated 42 U.S.C. § 12112(b)(6) by arguing that the EEOC's

19  theory that the request for an MRI could be a "selection criterion" contradicted EEOC

20  interpretive guidance on a regulation interpreting that provision. (Id. at 6–7 (citing 29 C.F.R. §

21  1630.14 App.).) The Court, citing § 12112(b)(6) and 29 C.F.R. § 1630.14(b), did not find either

22  of these arguments persuasive. (Dkt. No. 28 at 5.)

23

24

1    BNSF now renews this argument in its motion for summary judgment, pointing out for

2    the first time that § 12112(b)(6) is intended to function as a disparate impact test and arguing it is

3    inappropriate to interpret "selection criterion" as an additional requirement imposed only on

4    individuals whom the employer may perceive as disabled, an interpretation that would transform

5    the provision into a disparate treatment test. (Dkt. No. 91 at 15.) It also repeats the argument that

6    the EEOC's interpretive guidance controls the scope of 29 C.F.R. § 1630.14(b) rather than

7    explaining one way the regulation might come into play. (Dkt. No. 91 at 15–16 (citing 29 C.F.R.

8    § 1630.14 App.).)

9    BNSF also argues that it did not decline to hire Holt on the basis of a "record of"

10   disability because his records did not show a substantially limiting impairment and it did not

11   decline to hire him on the basis of "regarded-as" disability because it did not know whether

12   Holt's prior or latent back condition constituted an actual impairment. (Dkt. No. 91 at 20–21.) In

13   its motion, EEOC points out that the 2008 amendments to the ADA relaxed the definition of

14   "regarded as" disability, see 42 U.S.C. § 12102(1)(C) & (3)(A), because Congress was

15   concerned courts were interpreting the former definition too strictly. (Dkt. No. 84 at 12-13.) See

16   generally 29 C.F.R. § 1630 App; ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-

17   325, 122 Stat. 3553 (2008).

18   The EEOC, meanwhile, argues it merits partial summary judgment on liability under §

19   12102 of the ADA, but reserves the issue of damages for trial.

20                                          **Discussion**

21   I.      Legal Standard

22   Summary judgment is appropriate if the evidence, when viewed in the light most

23   favorable to the non-moving party, demonstrates that "there is no genuine dispute as to any

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 6

1    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

2    See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant meets this initial burden,

3    then the burden shifts to the non-moving party to "designate specific facts" showing that there is

4    a genuine issue of material fact for trial that precludes summary judgment. Celotex Corp., 477

5    U.S. at 324. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party.

6    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it

7    "might affect the outcome of the suit under the governing law." Id.

8         "As long as a district court has jurisdiction over the case, then it possesses the inherent

9    procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to

10   be sufficient." City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper, 254 F.3d 882 (9th

11   Cir. 2001).

12        II.      Structure and Relevant Provisions of Title I of the ADA

13        Subsection (a) of § 12112, the generic discrimination provision for Title I of the ADA,

14   holds employers liable for discrimination "on the basis of disability." 42 U.S.C. § 12112(a).

15   (This phrasing is a change from "because of" disability made by the 2008 amendments to the

16   ADA.)

17        Subsection (b) of § 12112, titled "Construction," lists specific ways an employer might

18   discriminate on the basis of disability, including (b)(6),

19        using qualification standards, employment tests or other selection criteria that screen out
          or tend to screen out an individual with a disability or a class of individuals with
20        disabilities unless the standard, test or other selection criteria, as used by the covered
          entity, is shown to be job-related for the position in question and is consistent with
21        business necessity.

22

23

24

1   § 12112(b)(6). Subsection (b) makes clear that the list is not exhaustive: it states that "the term

2   'discriminate against a qualified individual on the basis of disability' <u>includes</u>" the following

3   acts, but does not limit discrimination to those acts. § 12112(b) (emphasis added).

4          The Parties' dispute over BNSF's request for an updated MRI from Mr. Holt centers on

5   subsection (d), titled "Medical examinations and inquiries." This provision specifies that medical

6   examinations can constitute discrimination, § 12112(d), but also explicitly permits medical

7   "employment entrance examination[s]" made after a conditional offer of employment but before

8   employment duties have commenced so long as the examinations adhere to certain requirements,

9   including that "the results of such examination are used only in accordance with [the ADA]." §

10  12112(d)(3)(C). The EEOC regulation interpreting this section elaborates,

11         Medical examinations conducted in accordance with this section do not have to be job-
           related and consistent with business necessity. However, if certain criteria are used to
12         screen out an employee or employees with disabilities as a result of such an examination
           or inquiry, the exclusionary criteria must be job-related and consistent with business
13         necessity, and performance of the essential job functions cannot be accomplished with
           reasonable accommodation as required in this part.
14
    29 C.F.R. § 1630.14(b)(3).
15
           The leading court of appeals case interpreting these provisions and the related regulation
16
    holds:
17
           Under § 12112(d)(3)(C), an employer's reasons for withdrawing a conditional job offer
18         must be "job-related and consistent with business necessity." 29 C.F.R. § 1630.14(b)(3).
           Moreover, the employer may only withdraw the conditional job offer if "performance of
19         the essential job functions cannot be accomplished with reasonable accommodation." <u>Id.</u>

20  <u>Garrison v. Baker Hughes Oilfield Operations, Inc.</u>, 287 F.3d 955, 960 (10th Cir. 2002). Another

21  court of appeals describes the central mandate of this section as "an individualized inquiry in

22  determining whether an employee's disability or other condition disqualifies him from a

23  particular position," and notes,

24
    ORDER ON CROSS MOTIONS FOR SUMMARY
    JUDGMENT, BNSF'S MOTION FOR
    SANCTIONS, BNSF'S MOTION TO EXCLUDE
    TESTIMONY- 8

1

2

> In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer <u>must conduct an individualized inquiry</u> into the individual's actual medical condition, <u>and</u> the impact, if any, the condition might have on that individual's ability to perform the job in question.

3

4

<u>Holiday v. City of Chattanooga</u>, 206 F.3d 637, 643 (6th Cir. 2000) (emphasis added). The Ninth

5

Circuit has not yet interpreted the circumstances in which employers are permitted to withdraw

6

conditional offers in any depth. <u>Cf.</u> <u>Norman-Bloodsaw v. Lawrence Berkeley Lab.</u>, 135 F.3d

7

1260, 1273 (9th Cir. 1998) (holding that neither post-offer examinations themselves nor medical

8

records selected for retention by the employer that are derived from such examinations need be

9

job-related or consistent with business necessity), <u>Leonel v. Am. Airlines, Inc.</u>, 400 F.3d 702,

10

709 (9th Cir. 2005) (noting that restricting medical examinations to the post-offer stage requires

11

employers to "isolate[]" their consideration of medical issues so that "applicants know when they

12

have been denied employment on medical grounds and can challenge an allegedly unlawful

13

denial"). However, the Tenth Circuit's approach, where a conditional offer becomes irrevocable

14

after the medical examination unless the employer can identify a legitimate basis for excluding

15

the applicant that is job-related and consistent with business necessity, finds support in the

16

legislative history. <u>See</u> Chai R. Feldblum, <u>Medical Examinations and Inquiries Under the</u>

17

<u>Americans with Disabilities Act: A View from the Inside</u>, 64 Temp. L. Rev. 521, 537 (1991)

18

(citing H.R. Rep. No. 485, 101st Cong., 2d Sess., pt. 3, at 43) ("[R]esults [of medical

19

examinations] may not be used to withdraw a conditional job offer from an applicant unless they

20

indicate that the applicant is not qualified to perform the job."); 136 Cong. Rec. 10,872 (1990)

21

(statement of Representative Weiss) ("The results of the examination can only be used to

22

withdraw a job offer if the applicant is found not to be qualified for the job based on the results

23

of the exam.").

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT, BNSF'S MOTION FOR SANCTIONS, BNSF'S MOTION TO EXCLUDE TESTIMONY- 9

1    III.    Liability

2        Rather than recognizing the structure of these provisions and the basic individualized-

3    inquiry mandate of the ADA, however, the Parties engage in skirmishes over more marginal

4    issues. The Court addresses those arguments and then moves on to the basic liability question.

5        A.  ADA Liability on the Basis of Selection Criteria

6        In the EEOC's Amended Complaint, the EEOC argues BNSF's actions with respect to

7    Claimant Russell Holt violated Sections 102(a), 102(b)(6), and 102(d)(3) of Title I of the ADA

8    (Dkt. No. 11 at 3)—i.e., the generic discrimination provision, 42 U.S.C. § 12112(a), the

9    "selection criteria" subtype of that discrimination provision, 42 U.S.C. § 12112(b)(6), and the

10   restriction on use of medical records obtained pursuant to an "employment entrance

11   examination." 42 U.S.C. § 12112(d). The Court's order on BNSF's motion to dismiss referred to

12   the "selection criteria" subtype in holding that the Amended Complaint stated a claim. (Dkt. No.

13   28 at 5 ("BNSF's requirement that Holt procure a follow-up MRI after the post-offer, pre-

14   employment examination functioned as a screening criterion that screened out an applicant with

15   a disability by imposing an expensive additional requirement not imposed on other applicants.")

16   (emphasis added).)

17       BNSF now argues for the first time that § 12112(b)(6) is a disparate-impact, not a

18   disparate-treatment provision, citing Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003), and

19   interpretive guidance to the regulations interpreting the section. BNSF is correct that Raytheon

20   puts § 12112(b)(6) squarely into the disparate-impact category. See 540 U.S. at 53 (explaining

21   that disparate impact claims are cognizable under the ADA and citing "using qualification

22   standards, employment tests or other selection criteria that screen out or tend to screen out an

23   individual with a disability"—language lifted directly from § 12112(b)(6)—as an example); see

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 10

1   also Lopez v. Pacific Maritime Assoc., 657 F.3d 762, 766–67 (9th Cir. 2011) (holding that a

2   plaintiff waived his disparate-impact ADA claim by not citing § 12112(b)(6) in his opening

3   brief).

4          EEOC's theory about selection criteria, in contrast, tries to shoehorn the request for an

5   MRI into § 12112(b)(6) even though it was not an across-the-board requirement for all

6   applicants. (Dkt. No. 96 at 10–15.) The EEOC tries to justify its approach by arguing the Ninth

7   Circuit used § 12112(b)(6) as a disparate treatment standard in Bates v. United Parcel Serv., Inc.,

8   511 F.3d 974 (9th Cir. 2007) (en banc). This reading of the case is incorrect. See id. at 989

9   ("Where an across-the-board safety 'qualification standard' is invoked, the question then

10  becomes what proof is required with respect to being a 'qualified individual,' that is, one who

11  can perform the job's essential functions."). In fact, no Ninth Circuit case or district court case

12  within the Ninth Circuit (save this Court's order on the initial motion) has accepted §

13  12112(b)(6) as the standard for a claim made on the basis of disparate treatment.

14         EEOC also cites to a district court case in which the court tentatively accepted a disparate

15  treatment analysis under § 12112(b)(6) of a request for additional medical information similar to

16  the MRI request here. See EEOC v. Am. Tool & Mold, Inc., 21 F. Supp. 3d 1268, 1284 (M.D.

17  Fla. 2014) ("To the extent one could argue that obtaining the release/restriction was an

18  independent 'exclusionary criteria,' ATM has not identified any 'job-related' criteria consistent

19  with a 'business necessity,' as required by 29 C.F.R. § 1630.14(b)(3), that would justify the

20  additional obligation."). However, in that case, the court appeared to rely primarily on the Tenth

21  Circuit and Sixth Circuit's interpretation of the statutory scheme in relation to § 12112(d)(3)(C),

22  emphasizing that "the parties agree[d] that the results of the pre-employment screening may only

23  be used to withdraw an offer of employment where an individualized determination reveals that

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 11

1   the impairment will preclude the putative employee from performing the essential functions of

2   the position." Id. at 1283.

3       While the Court agrees with BNSF that the EEOC has not demonstrated that actual

4   "qualification standards, employment tests or other selection criteria" were employed by BNSF

5   to disqualify Mr. Holt, the fact that "discrimination" under § 12112(a) is not limited to the

6   categories listed in § 12112(b) means that BNSF has not necessarily escaped liability on the

7   EEOC's generic § 12112(a) claim.

8       B.   Request Versus Requirement for Additional Medical Information

9       The EEOC and BNSF also spend an inordinate number of pages addressing the question

10  whether BNSF's Dr. Jarrard was medically justified in seeking an updated MRI on the basis of

11  the medical record he was reviewing. The EEOC goes so far as to offer expert testimony on the

12  question whether such a request was medically justified and BNSF moves to exclude it. (See

13  Dkt. No. 87, Ex. A;  Dkt. No. 90.) The EEOC's enforcement guidance makes clear that the

14  medical-justification question is irrelevant: Employers may "ask specific individuals for more

15  medical information," including "follow-up examinations," as long as they are "medically

16  related to the previously obtained medical information." Enforcement Guidance: Preemployment

17  Disability-Related Questions and Medical Examinations (1995)

18  (http://www.eeoc.gov/policy/docs/preemp.html) ("Preemployment Guidance")[1]; see also

19  Christen v. Harris Cnty., 529 U.S. 576, 587–588 (2000) (noting that opinion letters, "like

20  ────────────────

21      [1] The EEOC does not attempt to explain this enforcement guidance, falling back instead
    on the Court's order on BNSF's motion to dismiss. The allegations which the Court relied on for

22  the purposes of that order, however, were that Mr. Holt had been "cleared" in an initial medical
    examination. (See Dkt. No. 28 at 2.) In fact, while BNSF's contractor was entitled to "clear"

23  candidates after the initial medical examination, it could also send the applicant's information to
    BNSF's medical department for review and a decision, which is what happened here. (Dkt. No.

24  91 at 5 (citing Kowalkowski Dep., Dkt. No. 91, Ex. 9 at 44:20–45:15).)

1   interpretations contained in . . . enforcement guidelines," do not warrant <u>Chevron</u> deference but

2   are entitled to respect under <u>Skidmore</u> to the extent of their persuasive power or <u>Auer</u> deference

3   where the regulation is ambiguous). The guidance does not require a follow-up examination to

4   be somehow medically justified, only that it be "medically related," so there is no material fact,

5   disputed or otherwise, with respect to the medical justification for Dr. Jarrard's request for an

6   updated MRI. The Court does not base any aspect of its decision on the EEOC's expert

7   testimony.

8          However, the question whether BNSF discriminated on the basis of disability does not

9   end there. While this enforcement guidance helps BNSF justify its request for an updated MRI, it

10  does not shield the employer from liability for its actions upon not receiving the MRI. The

11  guidance allows employers to "ask . . . for more medical information" and, by implication, to

12  perform a follow-up additional examination; nowhere does it endorse the practice of requiring

13  the applicant to pay for costly additional information as a condition of proceeding through the

14  hiring process. The guidance also provides the following illustration:

15      Example:  At the post-offer stage, an employer asks new hires whether they have had back
        injuries, and learns that some of the individuals have had such injuries.  The employer <u>may</u>
16      <u>give medical examinations</u> designed to diagnose back impairments to persons who stated that
        they had prior back injuries, as long as these examinations are medically related to those
17      injuries.

18  Preemployment Guidance (emphasis added). This illustration clearly suggests that the employer

19  or its agent will conduct the medical examination "designed to diagnose back impairments."

20  Here, in contrast, Mr. Holt was required to procure an MRI at his own cost in order to proceed

21  with the hiring process. The guidance does not address this additional obligation.

22

23

24
    ORDER ON CROSS MOTIONS FOR SUMMARY
    JUDGMENT, BNSF'S MOTION FOR
    SANCTIONS, BNSF'S MOTION TO EXCLUDE
    TESTIMONY- 13

1        C.  Cooperation Obligation

2            BNSF briefly argues that it cannot be liable for using the "results" of the medical

3   examination other than in accordance with the ADA because "if an applicant refuses to cooperate

4   in the examination, the employer never obtains the 'results' to use." (Dkt. No. 91 at 16.) There is

5   limited ADA case law regarding the obligation of employees (i.e., after the entrance examination

6   stage) to cooperate with legitimate medical examinations, but these courts emphasize that the

7   employer offered to pay for or conduct the medical examination at issue. See, e.g., EEOC v.

8   Prevo's Family Mkt., Inc., 135 F.3d 1089, 1097 (6th Cir. 1998); Grassel v. Dep't of Educ. of

9   City of New York, No. 12 CV 1016 PKC, 2015 WL 5657343, at *3, *9 (E.D.N.Y. Sept. 24,

10  2015). A generic cooperation obligation where the employer has offered to pay is not relevant to

11  the facts of this case. More to the point, BNSF can hardly argue that it had no examination

12  "results" to work with: Mr. Holt had undergone an initial medical examination, provided a 2007

13  MRI that showed a two-level disc extrusion, and answered a questionnaire in which he admitted

14  to a back injury. Those are the results at issue here.

15       D.  ADA Liability on the Basis of § 12112(a)

16          To state a prima facie case for disability discrimination, the EEOC must show (1) that

17  Mr. Holt is disabled within the meaning of the ADA; (2) that he is a qualified individual with a

18  disability; and (3) that he was discriminated against because of his disability. Smith v. Clark Cty.

19  Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013). The Ninth Circuit has held that the causation

20  standard applicable to § 12112(a) disparate treatment claims is the "motivating factor" test. Head

21  v. Glacier Nw., Inc., 413 F.3d 1053, 1065 (9th Cir. 2005), abrogated on other grounds in Univ.

22  of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); see also Siring v. Or. State Bd. of

23  Higher Educ. ex rel. E. Or. Univ., 977 F. Supp. 2d 1058, 1063 (D. Ore. 2013) (holding that in

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 14

light of liberalizing amendments to the ADA and in the absence of any alteration in Ninth Circuit

precedent following Nassar, the motivating factor test continues to apply).

                1.   Prima Facie Case of Disparate Treatment

        The Court addresses the third element—discrimination because of disability—first.

Because employers may withdraw conditional offers based only on the applicant's failure to

meet standards that are job-related and consistent with business necessity and only where

performance of the essential job functions cannot be accomplished with reasonable

accommodation, see Garrison, 287 F.3d at 960, BSNF's withdrawal of Mr. Holt's job offer when

he failed to supply an updated MRI at his own cost constituted facial "discrimination."

Undisputed facts also establish causation: A reasonable jury could not escape the conclusion that

in the absence of the 2007 MRI and Mr. Holt's answers to the CHS medical questionnaire—

"results" obtained from the post-offer medical examination, see § 12112(d)(3)(C)—BNSF would

not have demanded an additional MRI and would not have treated Mr. Holt as though he had

declined his offer, although he had not.[2] Meanwhile, nothing prevented BNSF from paying for

an updated MRI when Mr. Holt informed the company he could not obtain an MRI on his own.

---

[2] The Ninth Circuit has performed McDonnell Douglas burden-shifting after the ADA prima facie case, which itself incorporates a causation element. See, e.g., Mayo v. PCC Structurals, Inc., 795 F.3d 941, 944 (9th Cir. 2015). The Court agrees with the Sixth Circuit, see Whitfield v. Tennessee, 639 F.3d 253 (6th Cir. 2011), which has held that combining McDonnell Douglas burden-shifting with a prima facie case incorporating causation "makes little sense, as its third element—whether the employee was, in fact, discharged because of the disability—requires at the prima facie stage what the McDonnell Douglas burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary." Id. at 259. To the extent that burden-shifting is required here, the Court holds that BNSF has failed to produce a legitimate, non-discriminatory reason for failing to hire Mr. Holt: first, because its actions in response to not receiving an MRI were not legitimate under the ADA's entrance examination framework, as discussed above, and second, because the request for an MRI was itself occasioned by evidence of his disability rather than constituting an independent, non-disability-based rationale.

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 15

1    The question then becomes whether this disparate treatment on the basis of Mr. Holt's

2    2007 MRI and answers to the CHS medical questionnaire constitutes disparate treatment because

3    of Mr. Holt's "disability" (the first prong of the prima facie case). The primary argument BNSF

4    makes regarding the EEOC's prima facie case is that Mr. Holt was neither "regarded-as"

5    disabled nor had a "record-of" disability. (Dkt. No. 98 at 14–15, Dkt. No. 91 at 20–21.) But as

6    the EEOC notes, the 2008 amendments to the ADA relaxed the application of the "regarded-as"

7    definition significantly. "An individual meets the requirement of 'being regarded as having such

8    an impairment' if the individual establishes that he or she has been subjected to an action

9    prohibited under this chapter because of an <u>actual or perceived</u> physical or mental impairment

10   <u>whether or not the impairment limits or is perceived to limit a major life activity</u>." 42 U.S.C. §

11   12102(3) (emphasis added); <u>see also</u> <u>id.</u> at § 12102(4)(a) ("The definition of disability in this

12   chapter shall be construed in favor of broad coverage of individuals under this chapter, to the

13   maximum extent permitted by the terms of this chapter."). This extremely low bar is met here

14   because Mr. Holt admitted to BNSF that he had a back injury and provided an MRI showing a

15   two-level disc extrusion, and BNSF halted the hiring process in response to that information. <u>See</u>

16   29 C.F.R. § 1630 App. ("To illustrate how straightforward application of the 'regarded as' prong

17   is, if an employer refused to hire an applicant because of skin graft scars, the employer has

18   regarded the applicant as an individual with a disability."); 29 C.F.R. § 1630.2 ("[E]valuation of

19   coverage can be made solely under the 'regarded as' prong of the definition of disability, which

20   does not require a showing of an impairment that substantially limits a major life activity or a

21   record of such an impairment"). The severity of Mr. Holt's limitations, if any, is no longer at

22   issue in a regarded-as claim so long as causation is established, and BSNF's citation to cases that

23   precede the ADAAA is not helpful. BNSF's argument that it did not perceive Mr. Holt's

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 16

1    reported back injury as an "impairment" of any sort, meanwhile, is not persuasive in the absence

2    of post-ADAAA case law.

3           On the second prong of the prima facie case, BNSF makes no attempt to argue that Mr.

4    Holt was not otherwise a "qualified individual," and indeed, he had already received a

5    conditional offer and was performing similar work as a police officer at the time of his

6    application. EEOC has established a prima facie case for disparate treatment on the basis of

7    disability.

8                      2.   Direct Threat

9           BNSF is not relying on the direct threat defense except insofar as it relates to the request

10   for the MRI. (Dkt. No. 98 at 19–20.) Unfortunately, the mere existence of a direct threat

11   affirmative defense does not justify its failure to hire Mr. Holt or to identify a legitimate

12   qualification standard which Mr. Holt could not meet. The direct-threat-to-self affirmative

13   defense—a requirement that an employee not pose a direct threat to his or her own health—is a

14   recognized qualification standard under the ADA. See 29 C.F.R. § 1630.15(b)(2). (See also Dkt.

15   No. 98 at 12–13 ("[Qualification standards or selection criteria] refer to physical requirements,

16   such as height requirements, requirements related to particular medical conditions, or, more

17   generally, that an employee not pose a direct threat to the health or safety of the applicant or

18   others.").) BNSF bears the burden of establishing that Mr. Holt was a direct threat. Nunes v.

19   Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999).

20          Here, the direct threat assessment was never made by BNSF because it halted the hiring

21   process when Mr. Holt failed to provide an MRI at his own cost. (See Dkt. No. 98 at 3.) But even

22   assuming that an updated MRI was relevant to a determination whether Mr. Holt's back

23   condition posed a direct threat to his own health in the workplace setting, it does not follow that

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 17

1  the MRI was strictly necessary to BNSF's direct-threat analysis. The applicable regulations

2  instruct that a direct-threat determination "shall be based on a reasonable medical judgment that

3  relies on the most current medical knowledge and/<u>or on the best available objective evidence</u>."

4  29 C.F.R. § 1630.2(r) (emphasis added); <u>see also</u> <u>Den Hartog v. Wasatch Acad.</u>, 129 F.3d 1076,

5  1090 (10th Cir. 1997) ("29 C.F.R. § 1630.2(r) does not require an independent medical

6  examination when the available objective evidence is clear. It uses the conjunctive "and/or"

7  between medical knowledge and objective evidence.").  BNSF may not have been able to access

8  "the most current medical knowledge" about Mr. Holt's back condition unless it was willing to

9  pay for it, but it could make the assessment based on the "best available" evidence—<u>i.e.</u>, the

10  objective information it could glean from the medical examination its contractor had already

11  performed and the records Mr. Holt was able to provide.

12       Conversely, if BSNF nonetheless believed the MRI was necessary to a reliable direct-

13  threat analysis, BNSF could have paid for the test. One would expect BNSF to pay for proof of a

14  direct threat, given the liability to which a prima-facie disability-based decision exposes a

15  company.

16       Because BNSF has failed to present evidence that Mr. Holt posed a direct threat to his

17  own health, it has failed to point to disputed material facts that preclude partial summary

18  judgment in favor of the EEOC.

19       IV.    Sanctions

20       BNSF brings a separate motion for sanctions against the EEOC for failure to preserve a

21  voicemail from a witness, Dr. Heck, who had called the EEOC to explain that he was mistaken

22  when he testified at his deposition that there was a clinical note missing from Mr. Holt's file.

23  (Dkt. No. 114.) A federal trial court has the inherent discretionary power to make appropriate

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 18

1 | evidentiary rulings in response to the destruction or spoliation of relevant evidence, including the

2 | power where appropriate to order the exclusion of certain evidence. <u>Glover v. BIC Corp.</u>, 6 F.3d

3 | 1318, 1329 (9th Cir. 1993).

4 |        Dr. Heck's voicemail is not evidence. Furthermore, there is neither fault by the EEOC

5 | nor prejudice to BNSF in the factual scenario presented here. The EEOC explains that the

6 | voicemail was unintentionally purged by the voicemail system maintained by the General

7 | Services Administration, and that the EEOC offered to reopen Dr. Heck's deposition so that he

8 | could clarify the matter with BNSF's counsel directly. (Dkt. No. 114 at 13–18.)

9 |        Sanctions are not warranted on this record.

10 |        V.     Motion to Exclude Testimony of Dr. Guy Earle

11 |        In connection with its summary judgment motion, BNSF moves to exclude the testimony

12 | of Dr. Guy Earle. (Dkt. No. 90.) Because the Court does not find it necessary to rely on Dr.

13 | Earle's testimony in order to decide the motions for summary judgment, the Court finds the

14 | motion moot. To the extent the EEOC seeks to reintroduce the testimony at the trial on

15 | damages—the only issue remaining in this case—BNSF may renew its motion.

16 | **Conclusion**

17 |        Because BNSF withdrew its conditional offer to Mr. Holt on grounds not sanctioned by

18 | the ADA and its accompanying regulations, the EEOC provided sufficient undisputed evidence

19 | to establish a prima facie case for disparate treatment under § 12112(a), and BNSF failed to offer

20 | evidence in support of the affirmative defense of a direct threat, the Court DENIES BNSF's

21 | Motion for Summary Judgment (Dkt. No. 91) and GRANTS the EEOC's Motion for Partial

22 | Summary Judgment on liability (Dkt. No. 84). The Court further DENIES BNSF's Motion for

23 | Sanctions (Dkt. No. 114) because the purged voicemail from a witness to Plaintiff's counsel is

24 |

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 19

1 | not evidence, among other reasons, and finds BNSF's Motion to Exclude Testimony of Dr. Guy

2 | Earle (Dkt. No. 90) MOOT at the summary judgment stage because it was not necessary to

3 | consider the testimony in order to reach a decision on summary judgment.

4

5

      The clerk is ordered to provide copies of this order to all counsel.

6

      Dated this 8th day of January, 2016.

7

8

9

        Marsha J. Pechman
        Chief United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY
JUDGMENT, BNSF'S MOTION FOR
SANCTIONS, BNSF'S MOTION TO EXCLUDE
TESTIMONY- 20